IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 17, 2009 Session

## CHRISTY LEANN SMITH v. LEONA M. PRATT, EXECUTRIX OF THE ESTATE OF STEPHEN M. PRATT, M.D., DECEASED, AND HCA HEALTH SERVICES OF TENNESSEE, INC. D/B/A CENTENNIAL MEDICAL CENTER

Appeal from the Circuit Court for Davidson County
No. 04C-2961    Barbara Haynes, Judge

No. M2008-01540-COA-R9-CV - Filed April 22, 2009

Patient sued her surgeon for malpractice and the hospital for allowing the surgeon to practice in its facilities. The trial court ruled that the hospital was not eligible for the qualified immunity provided in Tenn. Code Ann. § 63-6-219(d)(1). We reverse.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., joined. FRANK G. CLEMENT, JR. filed a concurring opinion.

Frank Grace, Jr., Brian D. Cummings, Clarence James Gideon, and Brian P. Manookian, Nashville, Tennessee, for the appellants, Leona M. Pratt, Executrix of the Estate of Stephen M. Pratt, M.D., Deceased, and HCA Health Services of TN, Inc. d/b/a Centennial Medical Center.

George H. Nolan and Eric W. Smith, Nashville, Tennessee, for the appellee, Christy Leann Smith.

### OPINION

The plaintiff, Christy Leann Smith, went to see Dr. Stephen Pratt, a plastic surgeon, concerning excess skin on various parts of her body due to weight loss. On November 20, 2003, Dr. Pratt performed several surgical procedures on Ms. Smith.[1] She was discharged from Centennial Medical Center on November 22, 2003. About ten days later, Ms. Smith developed open wounds on her back and thigh. Dr. Pratt sutured them. Several days later, she complained to Dr. Pratt of

---

[1]These procedures were designed to remove excess skin from her body and to lift and tighten her buttocks, arms and legs. According to the complaint, these procedures are sometimes referred to as a whole body lift.

pain in her lower left calf and in the wounds in her back and thigh. He gave her a prescription for Avelox.

By December 10, Ms. Smith had developed shortness of breath along with increased pain in her left leg. She went to the Saint Thomas Hospital emergency room where a test showed deep vein thrombosis (a blood clot). She was transferred to Centennial, where Dr. Pratt ordered a pulmonary consult. She was found to have a pulmonary embolism and prescribed Coumadin, a blood-thinning medicine. After her discharge from Centennial, Ms. Smith saw Dr. Pratt, who again closed the wound on her back.

On December 24, 2003, Ms. Smith went to Centennial's emergency room with complaints of chest pain and shortness of breath. Her blood had become too thin and she was bleeding into her lungs. Blood was drained from her lungs. After her discharge from Centennial, she continued to visit Dr. Pratt through March 2004 to address the open wounds on her thigh and lower back.

Ms. Smith filed a malpractice action against Dr. Pratt's estate.[2] She also sued Centennial Medical Center, alleging that Centennial should not have granted surgical privileges to Dr. Pratt and should have revoked his privileges because Dr. Pratt was incompetent and dangerous. Centennial filed a motion for summary judgment claiming Tenn. Code Ann. § 63-6-219 provides qualified immunity for credentialing decisions and that it was not negligent in renewing Dr. Pratt's privileges in 2002. On May 7, 2007, the trial court denied Centennial's motion for summary judgment. The application of Tenn. Code Ann. § 63-6-219 was raised again in Centennial's motion to dismiss and during a pre-trial conference. The trial court issued an order on June 23, 2008, stating, "[u]nder the facts of this case, immunity for Centennial would be contrary to the central purpose of the statute, which is to encourage the medical profession to police its members without fear of being sued by physicians who are disciplined by their peers." Centennial moved for and the trial court granted permission to seek an interlocutory appeal. This court granted the application for the interlocutory appeal.

Standard of Review

This appeal is solely concerned with the interpretation of Tenn. Code Ann. § 63-6-219, which is an issue of law, so we review the issue de novo with no presumption of correctness. *See Daron v. Dep't of Corr.*, 44 S.W.3d 478, 480 (Tenn. 2001).

Analysis

The basis of this action against Centennial is the decision of its peer review committee to recommend renewal of Dr. Pratt's surgical privileges. The qualified immunity sought by Centennial is found in Tenn. Code Ann. § 63-6-219(d)(1), which states:

---

[2]By the time the lawsuit was filed on October 13, 2004, Dr. Pratt had died.

2

All state and local professional associations and societies and other organizations, institutions, foundations, entities and associated committees as identified in subsection (c), physicians, surgeons, registered nurses, hospital administrators and employees, members of boards of directors or trustees of any publicly supported or privately supported hospital or other such provider of health care, any person acting as a staff member of a medical review committee, any person under a contract or other formal agreement with a medical review committee, any person who participates with or assists a medical review committee with respect to its functions, or any other individual appointed to any committee, as such term is described in subsection (c), is immune from liability to any patient, individual or organization for furnishing information, data, reports or records to any such committee or for damages resulting from any decision, opinions, actions and proceedings rendered, entered or acted upon by such committees undertaken or performed within the scope or function of the duties of such committees, if made or taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist. Such immunity also shall extend to any such entity, committee, or individual listed in this subsection (d) when that entity, committee, or individual provides, or attempts to provide, assistance directly related to and including alcohol or drug counseling and intervention through an impaired professional program, or if none, through a requesting professional society, to any title 63 licensee, or applicant for license. Physicians health programs and physicians health peer review committees shall be immune from liability for providing intervention, referral, and other support services to the minor children or spouse or both of physicians.

When interpreting a statute, the court is to ascertain the intent of the legislature from the natural and ordinary meaning of the language used and in the context of the entire statute. *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996). We are to give effect to every word and assume that the legislature deliberately chose to use these words. *Id.* at 827-28; *Tenn. Manufactured Hous. Ass'n v. Metro. Gov't of Nashville & Davidson County*, 798 S.W.2d 254, 257 (Tenn. Ct. App.1990); *see also Tidwell v. Collins*, 522 S.W.2d 674, 676-77 (Tenn. 1975). When the language of the statute is ambiguous, courts may consult the legislative history for additional guidance. *Lawrence County Educ. Ass'n v. Lawrence County Bd. of Ed.*, 244 S.W.3d 302, 309 (Tenn. 2007).

Although it is not a shining example of legislative drafting, the plain language of Tenn. Code Ann. § 63-6-219(d)(1) indicates that: (1) any of the entities or individuals mentioned (2) are immune from liability (3) to any patient, individual or organization (4) for damages (5) resulting from any decisions or proceedings (6) by peer review committees (7) within their scope of duties (8) made in good faith without malice (9) on the basis of facts reasonably known or reasonably believed to exist. These are the factors courts must examine to determine the applicability of the statutory qualified immunity.

Tenn. Code Ann. § 63-6-219(d)(1) states that "institutions" may be found immune. The Tennessee Supreme Court has already determined that hospitals are "institutions" under Tenn. Code Ann. § 63-6-219(d)(1). *Eyring v. Fort Sanders Parkwest Med. Ctr.*, 991 S.W.2d 230, 235 (Tenn. 1999) (concluding that "institution" as used in the statute must be interpreted to include hospitals in order to give proper effect to the stated legislative intent and purpose.).

The major issue of statutory interpretation between the parties is whether the qualified immunity applies when a patient sues the hospital. Previous appellate decisions have dealt only with physicians suing for loss or denial of practice privileges. *See, e.g., Eyring*, 991 S.W.2d at 232; *Logan v. Everett*, No. M2005-00012-COA-R3-CV, 2006 WL 223708 (Tenn. Ct. App. Jan. 27, 2006). The plain language of the statute supports the interpretation that the qualified immunity applies when a patient sues a hospital for a peer review committee's credentialing decision. The statute provides for immunity "from liability to any *patient*, individual or organization," for decisions made by the committee. Tenn. Code Ann. § 63-6-219(d)(1). We must assume the General Assembly deliberately chose to use the word "patient." *Tenn. Manufactured Hous. Ass'n,* 798 S.W.2d at 257.

Ms. Smith argues that granting immunity when a patient sues over a credentialing decision is inconsistent with the Peer Review Law, which was designed to encourage medical professionals "to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence and ability to practice medicine." Tenn. Code Ann. § 63-6-219(b)(1). We disagree with this argument. The qualified immunity policy is intended to encourage frank and thorough review of a doctor's fitness to practice medicine. The fact that an incorrect credentialing decision may have been made does not undercut this policy.[3]

Contrary to Ms. Smith's contention, the legislative history does not support her interpretation either. Representative Stanley Rogers, the sponsor of the 1975 legislation that enacted this section, stated that doctors "are reluctant to say another doctor is not practicing good medicine for fear of being sued by that particular physician. This bill will encourage doctors to police themselves to expose the bad practitioners who are causing the malpractice problem." Remarks of Rep. Rogers, tape No. H-139 (May 2, 1975). This statement is true, as far as it goes. It does not purport to be the only effect of the bill. Indeed, the inclusion of the word "patients" in the list of those who may sue indicates that the bill encourages honesty by immunizing individuals who report that another doctor is competent when that report ultimately proves to be in error.[4] The bill encourages truthfulness no matter what the informants say about the doctor seeking credentials.

---

[3] Of course, the decision must be made in good faith, without malice, on the basis of facts reasonably known or reasonably believed to exist. If a committee made a decision without a good faith review, with malice, or on negligently assembled facts, the immunity would not apply. Tenn. Code Ann. § 63-6-219(d)(1).

[4] The mere fact that Dr. Pratt may have committed malpractice does not mean that the hospital or the peer review committee was negligent in granting him privileges. *See Crumley v. Mem'l Hosp., Inc.*, 509 F. Supp. 531, 535 (E.D. Tenn. 1978); *see also Edmonds v. Chamberlain Mem'l Hosp.*, 629 S.W.2d 28, 30 (Tenn. Ct. App. 1981) ("No presumption of negligence in selection arises merely because the physician may have committed a negligent act after having been admitted to practice at a hospital.")

Ms. Smith's arguments on this issue fail in light of the inclusion of the word "patients" in Tenn. Code Ann. § 63-6-219(d)(1).

Ms. Smith also maintains that this interpretation of Tenn. Code Ann. § 63-6-219(d)(1) is inconsistent with Tennessee case law holding that hospitals owe patients a duty of reasonable care in selecting and retaining competent physicians. This appears to be the law in Tennessee before the passage of the 1975 act amending the Peer Review Law. *Quinn v. Kansas City, M. & B. R. Co.*, 30 S.W. 1036, 1037 (Tenn. 1895) ("[H]aving selected surgeons skilled and competent in their profession, the corporation discharged every duty that humanity or sound morals impose, and that it is to no extent liable for the mistakes they may subsequently commit.").

Ms. Smith relies on three cases for the proposition that hospitals owe patients a duty of reasonable care in selecting and retaining competent physicians. An examination of these cases reveals that their facts render them inapplicable to the matter at hand. In *Crumley,*, the court stated that, under Tennessee law, "if a health-provider does not use due care in the selection of a physician to treat those for whom health care is provided, the health-provider is liable for the subsequent negligence or malpractice of the physician selected." *Crumley*, 509 F. Supp. at 535. That case arose, however, from the administration of anesthesia on April 2, 1974, a year before the 1975 amendment to the Peer Review Law. The 1975 law did not apply to the action and, therefore, was not discussed.

*Bryant v. McCord*, No. 01A01-9801-CV-00046, 1999 WL 10085 (Tenn. Ct. App. Jan. 12, 1999), does not assist Ms. Smith either. While *Bryant* does say that "hospitals have a duty to use reasonable care . . . to select and retain only competent physicians," it relies on *Crumley* for that proposition. *Bryant*, 1999 WL 10085, at *11. We have already noted that *Crumley* does not apply. In addition, the issue in *Bryant* was the hospital's control over the use of investigational devices, not the selection or recommendation of a physician by a peer review committee. *Bryant* provides no assistance in resolving this case.

Similarly, *Wicks v. Vanderbilt Univ.*, No. M2006-00613-COA-R3-CV, 2007 WL 858780 (Tenn. Ct. App. Mar. 21, 2007), offers no guidance. While Vanderbilt tried to characterize the claim as a negligent credentialing claim in the trial court, Wicks disavowed that theory. *Wicks,* 2007 WL 858780, at *13. Instead the claim was viewed by the appellate court as one for negligent supervision. *Wicks* indicates that a component of negligent supervision can be a breach of the duty to hire competent employees, but that aspect of negligent supervision was never a focus of the case. *Id.* Rather, *Wicks* focused on failure to adhere to Vanderbilt policies.

Another case deserves mention. In *Edmonds v. Chamberlain Mem'l Hosp.*, 629 S.W.2d 28, 29-30 (Tenn. Ct. App. 1981), this court held that "a hospital is not liable for the negligence of the physician selected by the hospital unless at the time the physician was chosen or subsequently as he performed at the hospital it was known, or should have been known, that the physician was incompetent of perform the duties he was reasonably expected to undertake." In *Edmonds*, the doctor was not subjected to review by a peer review committee, so the qualified immunity of Tenn. Code Ann. § 63-6-219(d)(1) was not available and was not discussed. The court reiterated that "[n]o

presumption of negligence in selection arises merely because the physician may have committed a negligent act after having been admitted to practice at the hospital." *Id.* at 30.

We hold that the qualified immunity defense under Tenn. Code Ann. § 63-6-219(d)(1) is available when a patient sues a hospital for credentialing decisions made by a peer review committee.

The final issue raised by Ms. Smith is that Centennial's interpretation of the statute is unconstitutional under the open courts provision of Article I, Section 17 of the Tennessee Constitution, which states: "That all courts shall be open: and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay." She maintains "that Centennial's interpretation of the Peer Review Law would effectively eliminate any patient's claim against a hospital for negligently providing credentials to a bad physician." In support of her argument that eliminating the claim would violate the open courts provision, Ms. Smith relies on the following analysis from a scholarly article: "[t]he General Assembly may vary the nature and extent of remedies for existing rights and causes of action as long as some substantive remedy remains." William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution*, 27 U. Mem. L. Rev. 333, 425-26 (1997).

The case law on the open courts clause does not support her argument. In 1978, the Tennessee Supreme Court stated: "This Section of our constitution has been interpreted by this Court as a mandate to the judiciary and not as a limitation upon the legislature." *Harrison v. Schrader*, 569 S.W.2d 822, 827 (Tenn. 1978). In *Barnes v. Kyle*, the Court quoted with approval the following principles:

> The constitutional guaranty providing for open courts and insuring a remedy for injuries does not guaranty a remedy for every species of injury, but applies only to such injuries as constitute violations of established law of which the courts can properly take cognizance.

306 S.W.2d 1, 4 (Tenn. 1957) (quoting 16A C.J.S. *Constitutional Law* § 709c); *see also Harmon v. Angus R. Jessup Assocs., Inc.*, 619 S.W.2d 522, 524 (Tenn. 1981). In other words, "the remedy clause[5] tells courts they must provide remedies for legally defined injuries, but does not limit a legislature's power to define what is and is not an 'injury.'" David Schuman, *The Right to a Remedy*, 65 Temp. L. Rev. 1197, 1206 (1992).

Even the authority cited by Ms. Smith does not necessarily support her cause. The law review article on which she relies further states:

---

[5]The term "remedy clause" is often used to refer to state constitutional provisions such as Tennessee's open courts clause. David Shuman, The Right to a Remedy, 65 Temp. L. Rev. 1197, 1201-02 (1992).

If, however, the General Assembly sets out to alter traditional legal rights or to limit or curtail existing procedural remedies, it must either provide a reasonable substitute for the old remedy, or it must demonstrate that the alteration or abolition of the existing remedy is a reasonable response to an important societal need.

Koch, supra at 450. Tennessee courts have already upheld the statute of limitations for medical malpractice actions, finding a reasonable basis for the law:

At the time the legislature passed the statute of limitations eventually codified as Sec. 23-3415(a), T.C.A., this state and the nation were in the throes of what was popularly described as a "medical malpractice insurance crisis." Because of alleged increasing numbers of claims, insurance companies had grown reluctant to write medical malpractice policies. Where policies were available, premiums had risen astronomically.

The legislature could have seen in this situation a threat not only to the medical profession and its insurers, but also to the general welfare of the citizens of this state. As liability costs skyrocketed, so would the cost of health care. Physicians would be encouraged to cease practice or contemplate early retirement, and the number of available physicians would decrease. The practice of "defensive medicine," spawned by fear of costly legal actions, would lead to a lower quality of health care in general. These considerations may or may not have been valid; however, it is apparent that they were accepted by the legislature and formed the predicate for its action.

In addition, it could be argued that to the extent that safe estimates required by actuarial uncertainty, aggravated by the extended period during which a physician could be subject to potential liability, contributed to the increase in malpractice insurance costs, "it is understandable that a legislature intent upon halting such phenomenal increases would seek some method to increase the certainty of such estimates," i. e., an absolute three-year limit on the time within which actions could be brought.

*Harrison*, 569 S.W.2d at 826 (footnotes and citations omitted); *see also Newton v. Cox*, 878 S.W.2d 105 (Tenn. 1994)(upholding the contingency fee cap on medical malpractice claims).[6] It would seem that a limitation on a patient's ability to recover damages against a hospital for credentialing a physician who later committed malpractice would also be a reasonable response to the need to control medical costs.

---

[6]"It is conceivable that the General Assembly concluded that the contingency fee cap of Tenn. Code Ann. § 29-26-120 would further the purposes of the Medical Malpractice Act by reducing malpractice insurance costs and, therefore, reduce the cost of health care to the public." *Newton*, 878 S.W.2d at 110.

7

## Conclusion

We hold that the qualified immunity defense under Tenn. Code Ann. § 63-6-219(d)(1) is constitutional under the open courts clause of the Tennessee Constitution and available to a hospital when a patient sues the hospital for credentialing decisions made by a peer review committee. As important as this holding is, just as important is what we do not hold. We do not reach the issue of Centennial's qualified immunity in this case. That issue will require more proof from the hospital and is, therefore, remanded to the trial court for a determination of whether Centennial's credentialing decision was made in good faith, without malice, on the basis of facts reasonably known or reasonably believed to exist. Tenn. Code Ann. § 63-6-219(d)(1). We do not hold that the qualified immunity is available in situations other than those enumerated in Tenn. Code Ann. § 63-6-219(d)(1). In situations outside the scope of the statute, the law is well settled that "hospitals are liable for the negligent acts of their agents and employees even though they are selected with due care." *Edmonds*, 629 S.W.2d at 30.

Costs of appeal are assessed against the appellee, Christy Leann Smith, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE