**Marvin M. BOREN ex rel. Dorothy Faye BOREN**

v.

**Mark T. WEEKS, M.D., et al.**

Supreme Court of Tennessee, at Nashville.

May 6, 2008.

428

Christopher Kim Thompson, Murfreesboro, Tennessee, for the appellant, Marvin M. Boren.

Bryan Essary and Alan S. Bean, Nashville, Tennessee, for the appellee, River Park Hospital, Inc.

## OPINION

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined. WILLIAM C. KOCH, JR., J., not participating.

In this medical malpractice appeal, the trial court denied the hospital's motion for summary judgment finding that a factual dispute exists as to whether the hospital may be held vicariously liable for the alleged negligence of an independent contractor emergency room physician based on a theory of apparent agency. The Court of Appeals reversed the trial court and granted summary judgment to the hospital on all grounds, concluding that the hospital's "efforts to disavow that the emergency department physicians were agents of the hospital were sufficient to preclude the plaintiff's claims based on apparent agency." Upon thorough consideration of the record and of the applicable law, we hold that summary judgment was inappropriate because genuine issues of material fact exist concerning whether the hospital may be held vicariously liable under an apparent agency theory, and in particular whether the hospital provided its patient with adequate notice that the emergency room physicians were independent contractors rather than employees. Therefore, we reverse the Court of Appeals' decision granting summary judgment and remand this case to the trial court for further proceedings consistent with this opinion.

## Factual Background

Marvin M. Boren ("Mr. Boren") filed suit in the Warren County Circuit Court on May 16, 2005, against River Park Hospital, ("River Park"), Dr. Mark T. Weeks ("Dr. Weeks"), and several related entities.[1] The complaint alleged that Dr.

---

1. The complaint originally named as the hospital-defendant HCA, Inc. d/b/a/ Tristar Health System d/b/a River Park Hospital. The parties agreed to amend the style of the case and the pleadings to reflect that River Park Hospital, Inc. is the proper hospital defendant.

Weeks, an emergency room physician with staff privileges at River Park, deviated from the recognized standard of acceptable professional practice in the community during his care and treatment of Mr. Boren's deceased wife, Dorothy Faye Boren ("Mrs. Boren"). The complaint further alleged that River Park was vicariously liable for Dr. Weeks' negligence because Dr. Weeks "was acting within the scope of his authorized agency with River Park Hospital and with the apparent authority to do so on behalf of River Park."

On September 8, 2006, River Park filed a motion for summary judgment, and as grounds, alleged that it was neither negligent nor vicariously liable for the alleged negligence of Dr. Weeks. In response to this motion, Mr. Boren conceded that he could not establish an agency relationship between River Park and Dr. Weeks. Nonetheless, Mr. Boren contended that summary judgment was inappropriate because a factual dispute existed concerning whether an apparent agency existed between Dr. Weeks and River Park, and whether River Park adequately disclosed the nature of its relationship with Dr. Weeks to defeat Mr. Boren's assertion of apparent agency. Following is a summary of the facts gleaned from affidavits and deposition testimony River Park and Mr. Boren filed in support of their respective positions.

On the evening of May 26, 2004, Mrs. Dorothy Boren fell in her home. She went to the emergency department at River Park at approximately 9:13 a.m. the following morning, May 27, 2004. Her husband, Mr. Marvin Boren, dropped her off at the emergency entrance while he parked the car. When he entered the emergency room, his wife had already been taken to an examination room. Hospital admission staff asked Mr. Boren if he consented to treatment for his wife, handed Mr. Boren

papers, and told him "You need to sign this right here … for her." Mr. Boren initialed the first two pages of a three-page document titled "Consent for Medical Procedures and Treatment" ("Consent Form"). Mrs. Boren's signature appears on the last page, although Mr. Boren testified that he might have signed on her behalf. Mr. Boren testified that he was in a hurry and signed and initialed the forms quickly; he was never asked to read anything.

The Consent Form used by River Park included a disclaimer through which the hospital disavowed the existence of any employment or agency relationship with the emergency department physicians. This disclaimer was included in the second half of the first paragraph on the first page of the form. It was in bold, normal size font. It provided:

I understand those physicians providing medical services are not agents or employees of the Hospital. This includes but is not limited to: The emergency department physicians and physicians assistants, the anesthesiologists, the radiologists, the pathologists, and the physicians' [sic] on-call to the emergency department to render specialty services.

Mr. Boren testified that the staff never told him that the physicians were not employees or agents of the hospital. He saw no signs or notices advising him that the physicians were independent contractors rather than employees. Mrs. Boren was released later that morning after an emergency room physician, Dr. Fontenot, treated her for a left thigh hematoma and multiple rib contusions.

However, at approximately 7:50 p.m. that same evening, Mrs. Boren returned to River Park's emergency department complaining of continued pain. Mr. Boren accompanied her on this return visit, and he testified that the admission process was

similar to that of the morning visit. Mr. Boren again initialed the first two pages of a second three-page Consent Form and signed the last page. The first page of this form contained the same disclaimer language quoted above. On this occasion, Dr. Weeks evaluated Mrs. Boren and admitted her to the hospital, where she stayed for the next two days. Mrs. Boren was discharged home from the hospital on May 29, 2004.

On June 3, 2004, Mrs. Boren returned to the River Park emergency department for a third time, accompanied by her daughter, Rhonda King ("Ms. King"). On this occasion, Mrs. Boren complained of chest pain on her left side. Ms. King testified that upon their arrival at the emergency room, Mrs. Boren was taken to an examination area while Ms. King was asked by the hospital staff at the registration desk to initial and sign forms. Ms. King was asked a series of questions, which included whether she consented to medical treatment. However, hospital staff neither advised Ms. King that the emergency room physicians were independent contractors rather than employees or agents of the hospital, nor did Ms. King observe posted notices or signs advising her of the relationship between the hospital and the emergency room physicians. After again examining Mrs. Boren, Dr. Weeks diagnosed "chest wall pain" and "chest pain" and discharged Mrs. Boren.

Mrs. Boren returned to River Park for a fourth time on June 7, 2004, when she was admitted on an in-patient basis by her primary care physician. Mr. Boren again initialed and signed the Consent Form. A CT scan[2] of Mrs. Boren's chest revealed "[m]ultiple pulmonary emboli [in the] left and right arteries." Mrs. Boren died as a result of the emboli later that evening. Mr. Boren testified that on the occasions his wife sought medical treatment at the River Park emergency room neither he nor his wife chose the doctor who provided the treatment; rather, they relied upon the hospital to choose the emergency room physicians.

Dr. Weeks testified by deposition that he was not an employee of River Park but was at all times relevant to this litigation an employee of Sterling Healthcare, an independent company that provides emergency room physicians and hospitalists to hospitals on an independent contractor basis. Dr. Weeks was unfamiliar with the terms of the contract between Sterling Healthcare and River Park, but he knew that the contract guaranteed that Sterling Healthcare would provide emergency room physicians to work all the shifts needed. Dr. Weeks acknowledged that he wears a name tag while working in River Park emergency room and that the name tag includes only his name and the name of his department and does not include either the name of the hospital, "River Park," or the name of his employer, "Sterling Healthcare." Finally, Dr. Weeks acknowledged that he did not tell Mrs. Boren or any of her family that he was an independent contractor and not an employee or agent of the River Park.

Christopher Miller[3] testified about the general admitting procedures at River Park's emergency room as well as about the specific admission of Mrs. Boren on June 3, 2004. Miller testified that the Consent Form is maintained in an electronic format on the computers in the ad-

---

**2.** A CT scan is an image produced by a "CAT scanner," which is "A device that produces cross-sectional x-rays of the body using computerized axial tomography." *Webster's II New College Dictionary* 181 (3rd ed.2005).

**3.** Because the parties did not file the full and complete depositions of Christopher Miller, Jan Kozak, or Jenny Milligan, we are unable to ascertain their job titles or duties.

mitting department and that the registrar asks a series of questions of a patient or a patient's representative, enters the answers provided into the computer, prints the form, and asks the patient or representative to sign and initial the form. The registrar does not ordinarily read the form to the patient or the patient's representative; the registrar merely summarizes the information as the questions are being asked. For example, concerning Part 1 of the Consent Form, the registrar asks whether the patient or patient's representative "give[s] consent for medical treatment and procedures." The registrar does not read that portion of Part 1 of the Consent Form which explains that the physicians are not employees or agents of the hospital. Miller testified that he typically spends about five minutes with a patient or a patient's representative and that River Park does not, as a matter of practice, explain to a patient or a patient's representative that emergency room physicians are independent contractors rather than employees or agents of the hospital. Miller explained that this information is provided only if a patient asks about the nature of the employment relationship between River Park and the emergency room physician. Miller could not recall whether Ms. King made such an inquiry when she registered her mother on June 3, 2004.

Jan Kozak participated in admitting Mrs. Boren to the emergency room on May 27, 2004. Kozak testified that she typically tells a patient or a patient's representative of the "consent for medical procedures" form and asks either the patient or the representative to sign and to initial the form. Kozak acknowledged that she does not typically either read the entire form or the statement regarding physicians not being employees or agents of the hospital to the patient.

Jenny Milligan testified that she was involved in the June 7, 2004 admission of Mrs. Boren. Milligan testified that the medical consent form was completed in an electronic format. Milligan asked certain questions of the patient, or patient's representative, such as whether the person consents to medical treatment. She then entered this information provided into the computer. Milligan does not, as a matter of practice, tell a patient or patient's representative that River Park's emergency room physicians are not employees or agents of the hospital. Instead, after her customary questions have been answered and the information inputted, Milligan prints the form for the patient to sign. At this time, patients are given a copy of the form that includes the disclosure regarding the nature of the relationship between River Park and emergency room physicians.

Considering these affidavits and depositions, on October 16, 2006, the trial court granted River Park's motion for summary judgment in part, dismissing all claims *except* those alleging an apparent agency relationship between River Park and Dr. Weeks. As to the claim based on an apparent agency theory, the trial court determined that genuine issues of material fact exist as to whether River Park may be held vicariously liable for the alleged negligence of Dr. Weeks. River Park sought an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, which was granted by the trial court and then by the Court of Appeals.

The Court of Appeals vacated the trial court's order and remanded the case to the trial court for entry of an order granting River Park's motion for summary judgment on all claims. Referring to the disclaimer in the Consent Form, the Court of Appeals concluded that "River Park's efforts to disavow that the emergency department physicians were agents of the

hospital were sufficient to preclude the plaintiff's claims based on apparent agency." We granted Mr. Boren's application for permission to appeal.[4]

## Analysis

Summary judgment is to be granted by a trial court only when the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.03; *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn. 1993). The party seeking summary judgment bears the burden of demonstrating that no genuine issues of material fact exist and that he is entitled to judgment as a matter of law. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn.2002). In reviewing the record to determine whether summary judgment requirements have been met, we must view all the evidence in the light most favorable to the non-moving party. *Eyring v. Fort Sanders Parkwest Med. Ctr., Inc.,* 991 S.W.2d 230, 236 (Tenn.1999); *Byrd,* 847 S.W.2d at 210–11. We review a trial court's grant of summary judgment de novo, according no presumption of correctness to the trial court's determination. *Blair v. W. Town Mall,* 130 S.W.3d 761, 763 (Tenn.2004); *Godfrey,* 90 S.W.3d at 695.

While Mr. Boren concedes that there is no evidence that Dr. Weeks is an actual agent of the hospital, he argues that the intermediate appellate court erred in granting River Park summary judgment because genuine issues of material fact exist as to whether apparent agency and/or agency by estoppel apply to make River Park vicariously liable for the negligence of Dr. Weeks. "In its broadest sense, the concept of agency 'includes every relation in which one person acts for or

represents another.' " *White v. Revco Disc. Drug Ctrs., Inc.,* 33 S.W.3d 713, 723 (Tenn.2000) (hereinafter "*Revco* ") (quoting *Kerney v. Aetna Cas. & Sur. Co.,* 648 S.W.2d 247, 253 (Tenn.Ct.App.1982)). The existence of an agency relationship is " 'a question of fact under the circumstances of the particular case,' " and is determined by examining the agreement between the parties or the parties' actions. *Revco,* 33 S.W.3d at 723 (quoting *McCay v. Mitchell,* 62 Tenn.App. 424, 463 S.W.2d 710, 715 (1970)).

When an agency relationship exists, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency. *Revco,* 33 S.W.3d at 723. The doctrine of respondeat superior permits the principal to be held liable for the negligent actions of his agent. *Smith v. Henson,* 214 Tenn. 541, 381 S.W.2d 892, 897 (1964). Conversely, a principal is generally not liable for the tortious acts of an independent contractor. *See, e.g., Givens v. Mullikin ex rel. McElwaney,* 75 S.W.3d 383, 394 (Tenn.2002); *Waggoner Motors, Inc. v. Waverly Church of Christ,* 159 S.W.3d 42, 52 (Tenn.Ct.App. 2004).

"Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency." *White v. Methodist Hosp. S.,* 844 S.W.2d 642, 646 (Tenn.Ct.App.1992) (hereinafter "*Methodist Hosp.*") (citing *Kelly v. Cliff Pettit Motors,* 191 Tenn. 390, 234 S.W.2d 822 (1950)).

Generally, to prove apparent agency one must establish (1) the principal actually

---

**4.** This case was consolidated for purposes of argument with *Dewald v. HCA Health Services of Tennessee,* 251 S.W.3d 423 (Tenn. 2008), which has been filed contemporaneously herewith.

or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment. *Mechs. Laundry Serv. v. Auto Glass Co. of Memphis*, 98 S.W.3d 151, 157 (Tenn.Ct. App.2002) (quoting *Methodist Hosp.*, 844 S.W.2d at 646) (internal citations omitted).

■ Apparent authority is established through the acts of the principal rather than those of the agent or through the perception of a third party. *See Bells Banking Co. v. Jackson Ctr.*, 938 S.W.2d 421, 424 (Tenn.Ct.App.1996). In *Southern Ry. Co. v. Pickle*, 138 Tenn. 238, 197 S.W. 675 (1917), this Court explained:

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent.

*Id.* at 677 (quoting 2 Corpus Juris 574, 575).

Whether and under what circumstances an apparent agency relationship may arise from a hospital's use of independent contractor physicians in its emergency room is an issue of first impression for this Court. However, several other jurisdictions have recently addressed either this precise issue, or similar issues, in depth. In *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142 (Ind. 1999), the Indiana Supreme Court conducted a thorough analysis of apparent agency as it applies to a hospital's liability for negligence in the provision of services, such as anesthesia or emergency room care, by independent contractors. The Court noted that other jurisdictions have held hospitals liable for the negligence of independent contractors in both situations, describing the rationale for these decisions as follows:

> While the language employed by these courts sometimes varies, generally they have employed tests which focus primarily on two basic factors. The first factor focuses on the hospital's manifestations and is sometimes described as an inquiry whether the hospital acted in a manner which would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital. Courts considering this factor often ask whether the hospital held itself out to the public as a provider of hospital care, for example, by mounting extensive advertising campaigns. In this regard, the hospital need not make express representations to the patient that the treating physician is an employee of the hospital; rather a representation also may be general and implied.
>
> The second factor focuses on the patient's reliance. It is sometimes characterized as an inquiry as to whether the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.

*Id.* at 151 (internal quotation marks and citations omitted). With regard to reliance, the Court explained that some jurisdictions look at whether the plaintiff reasonably believed that the hospital was providing the pertinent medical care, while other jurisdictions presume reliance.

*Id.* The Court concluded that: "[c]entral to both of these factors—that is, the hospital's manifestations and the patient's reliance—is the question of whether the hospital provided notice to the patient that the treating physician was an independent contractor and not an employee of the hospital." *Id.*

The Indiana Supreme Court ultimately adopted the formulation of apparent agency set forth in the Restatement (Second) of Torts § 429 (1965). *Id.* at 152. That section of the Restatement provides:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Restatement (Second) of Torts § 429. The Court construed this provision to require that the "trier of fact must focus on the reasonableness of the patient's belief that the hospital or its employees were rendering health care." *Sword,* 714 N.E.2d at 152. According to *Sword,*

> This ultimate determination is made by considering the totality of the circumstances, including the actions or inactions of the hospital, as well as any special knowledge the patient may have about the hospital's arrangements with its physicians. We conclude that a hospital will be deemed to have held itself out as the provider of care unless it gives notice to the patient that it is not the provider of care and that the care is provided by a physician who is an independent contractor and not subject to the control and supervision of the hospital. A hospital generally will be able to avoid liability by providing *meaningful*

> *written notice* to the patient, acknowledged at the time of admission.

*Id.* (emphasis added). The Court noted, however, that written notice might not suffice where a patient does not have an adequate opportunity to make an informed choice, such as in the case of a medical emergency. *Id.*

Similarly, the South Carolina Supreme Court adopted the approach set out in the Restatement (Second) of Torts § 429. *Simmons v. Tuomey Reg'l Med. Ctr.,* 341 S.C. 32, 533 S.E.2d 312, 322 (2000). The Court stated:

> Under section 429, the plaintiff must show that (1) the hospital held itself out to the public by offering to provide services; (2) the plaintiff looked to the hospital, rather than the individual physician, for care; and (3) a person in similar circumstances reasonably would have believed that the physician who treated him or her was a hospital employee. When the plaintiff does so, the hospital will be held vicariously liable for any negligent or wrongful acts committed by the treating physician.

*Id.* at 322. The Court limited this test's application "to those situations in which a patient seeks services at the hospital as an institution, and is treated by a physician who reasonably appears to be a hospital employee." *Id.* at 323.

Comparable tests have been adopted in several other jurisdictions, specifically with respect to the rendering of emergency services or anesthesia services. *See, e.g., Gilbert v. Sycamore Mun. Hosp.,* 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788, 796 (1993) (concluding that the element of "holding out" is "satisfied if the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors," and that "[t]he element of justifiable reliance on the part of the plain-

tiff is satisfied if the plaintiff relies upon the hospital to provide complete emergency room care, rather than upon a specific physician"); *Gatlin v. Methodist Med. Ctr., Inc.,* 772 So.2d 1023, 1027 (Miss.2000) (with respect to a hospital's liability for the acts of an independent contractor anesthesiologist, holding that the controlling "analysis seeks to determine whether the patient was seeking treatment from the hospital, without regard for the identity of the particular physicians working at the hospital, or whether the patient instead sought the services of a particular physician who merely happened to be on staff at a particular hospital"); *Diggs v. Novant Health, Inc.,* 177 N.C.App. 290, 628 S.E.2d 851, 862 (2006) (adopting Restatement (Second) of Torts § 429 to hold that "a plaintiff must prove that (1) the hospital has held itself out as providing medical services, (2) the plaintiff looked to the hospital rather than the individual medical provider to perform those services, and (3) the patient accepted those services in the reasonable belief that the services were being rendered by the hospital or by its employees. A hospital may avoid liability by providing meaningful notice to a patient that care is being provided by an independent contractor"); *Pamperin v. Trinity Mem'l Hosp.,* 144 Wis.2d 188, 423 N.W.2d 848, 857 (1988) (concluding that if the plaintiff proves that the hospital "held itself out as a provider of emergency room care without informing [plaintiff] that the care was provided by independent contractors, [plaintiff] has satisfied the first requirement for proving liability under the doctrine of apparent authority. . . . In determining that a plaintiff acted in reliance upon the conduct of the hospital or its agent ... [c]ourts have uniformly recognized that, except when the patient enters a hospital intending to receive care from a specific physician while in the hospital, it is the reputation of the hospital itself upon which a patient relies.").

Our intermediate appellate courts have followed a similar analysis when faced with the issue. In *Edmonds v. Chamberlain Mem'l Hosp.,* 629 S.W.2d 28, 29 (Tenn.Ct. App.1981), the plaintiff's husband was taken to the emergency room of the defendant's hospital where he was treated by an emergency room physician and then sent home. After the plaintiff's husband died, litigation ensued, and the issue became whether the hospital was liable for the alleged negligence of the emergency room physician. *Id.* The hospital denied liability, pointing out that the physician was an independent contractor, not an employee or agent. *Id.* The trial court granted summary judgment for the hospital. The court of appeals reversed, however, finding "a disputed issue of material fact as to whether or not Dr. Loftis was the hospital's agent." *Id.* at 32.

The Court of Appeals cited the following facts in support of its holding: the emergency room operated in conjunction with the rest of the hospital; the hospital required all of the physicians with staff privileges to work in the emergency room on a rotating basis, treating members of the public who came to the hospital for emergency medical care; and all emergency treatment took place on the hospital's premises and utilized the hospital's supporting personnel and equipment. *Id.* The court also relied on the fact that "[t]he patient does not know or select the physician but relies upon the hospital for providing the physician." *Id.*

This issue next arose in *Methodist Hosp.,* where the plaintiff sued after suffering a cardiac arrest during a laproscopic sterilization procedure, resulting in severe and permanent brain damage. Overruling the trial court, the Court of Appeals reversed the grant of summary judgment, finding disputed factual issues as to whether the hospital was liable based on an

apparent agency theory. 844 S.W.2d at 648. The Court of Appeals so held, despite the absence of direct evidence of the patient's reliance on the alleged apparent agency relationship.

The *Methodist Hosp.* Court discussed *Edmonds,* then went on to explain the development of this area of law in other jurisdictions:

> An increasing number of jurisdictions have held that in situations where a hospital offers a service, such as the care of an anesthesiologist, and the patient has no part in choosing the individual who will perform the service, a court may infer that the patient reasonably relied on the health care provider's apparent authority to act for the hospital.

> Cases from other jurisdictions have concluded that unless there is some reason for a patient to believe that the treating physician in a hospital is an independent contractor, it is natural for the patient to assume reliance on the reputation of the hospital as opposed to any specific doctor. This reliance is often the reason the patient selects the hospital in the first place and these cases recognize his prerogative to make that assumption.

> [A] hospital should be vicariously liable for doctors in emergency or operating room settings notwithstanding the existence of a private contract with secret limitations between hospital and doctor or by virtue of some other business relationship unknown to the patient and contrary to the hospital's apparent representation. Patients often seek care and treatment from hospitals rather than from particular physicians. The patient entering the emergency room or operating theater seldom knows the name of the emergency medicine physician or anesthesiologist who will treat him.

*Id.* at 647 (internal quotations and citations omitted).

■■■ We agree with and adopt the analysis derived from the Restatement (Second) of Torts § 429 that has been adopted by many of our sister states. To hold a hospital vicariously liable for the negligent or wrongful acts of an independent contractor physician, a plaintiff must show that (1) the hospital held itself out to the public as providing medical services; (2) the plaintiff looked to the hospital rather than to the individual physician to perform those services; and (3) the patient accepted those services in the reasonable belief that the services were provided by the hospital or a hospital employee. *See, e.g., Sword,* 714 N.E.2d at 152; *Diggs,* 628 S.E.2d at 862; *Simmons,* 533 S.E.2d at 322.

■■■ As discussed in *Methodist Hosp.* and *Sword,* "[a] hospital generally will be able to avoid liability by providing meaningful written notice to the patient, acknowledged at the time of admission." *Sword,* 714 N.E.2d at 152; *see Methodist Hosp.,* 844 S.W.2d at 647. Thus the issue often becomes, as it does here, what constitutes "meaningful" notice. The court in *Sword* recognized that "[u]nder some circumstances, such as in the case of a medical emergency, . . . written notice may not suffice if the patient had an inadequate opportunity to make an informed choice." 714 N.E.2d at 152.

In *Cooper v. Binion,* 266 Ga.App. 709, 598 S.E.2d 6 (2004), the Georgia Court of Appeals analyzed what it meant to provide adequate notice to a patient. The plaintiff and his wife testified that they understood from the circumstances that the emergency room physician who treated the plaintiff was a hospital employee, particularly because the doctor did not see patients outside of the hospital's emergency room and told them that he could not be their pri-

vate doctor. *Id.* at 11. The wife further testified that they relied on the hospital's good reputation in accepting medical care from the emergency room physician. *Id.* The hospital countered that it explicitly informed the plaintiff and his wife that the physician was not an employee by posting a sign in the admissions area to that effect and by including a paragraph in the admitting documents (which were signed by the wife). *Id.* The court held:

> Generally, posting a conspicuous sign in the admissions area that the emergency room physicians are not hospital employees and having the patient sign an acknowledgment to this effect would preclude a claim of apparent authority. However, since there was testimony that a witness present that day did not recall seeing any such signs in the admissions area, and there was no testimony that either [plaintiff] or his wife saw such, some evidence would indicate that no such sign was posted or if so, it was not conspicuous. *The acknowledgment in the admitting form was one of thirteen paragraphs in a two-page document signed by [plaintiff's] wife, and nothing indicates that the hospital called attention to the acknowledgment.* Under these circumstances and evidence, we cannot hold that the hospital as a matter of law sufficiently notified [plaintiff] that Dr. Binion was not its employee.

*Id.* at 11–12 (internal citations omitted) (emphasis added).

 Just as with the court in *Cooper*, we are unable to hold in this case that the hospital, as a matter of law, sufficiently notified Mr. and Mrs. Boren that Dr. Weeks was not its employee. The acknowledgment in the consent form was found in the second half of one paragraph of a three-page form initialed and signed by Mr. Boren. There is nothing in the record that indicates that the hospital called attention to that acknowledgment. In fact, several registration and admission hospital staff members testified that the form was completed in an electronic format, that patients and their representatives were simply asked if they consented to treatment, and hospital staff did not as a matter of practice explain that the physicians were independent contractors rather than employees or agents.

River Park offers emergency services to the public. The Borens relied on the hospital to provide emergency care instead of relying on any particular physician. They accepted the services of the emergency room physicians with the belief that those physicians were employees of the hospital. While the hospital included a disclaimer in the consent form, we cannot say as a matter of law that the disclaimer provided the Borens with adequate notice under the circumstances.

**Conclusion**

In sum, we hold that the requirements for summary judgment have not been met because genuine issues of material fact exist regarding the issue of River Park's vicarious liability. River Park held itself out as providing emergency care to the public, and Mr. Boren testified that he and his wife relied on River Park to provide such emergency medical care and that they did not have the option to choose Mrs. Boren's emergency room physician. Factual disputes remain as to whether River Park provided the Borens with adequate notice of the contractual arrangement between the River Park and the emergency room physicians. Thus, we reverse the Court of Appeals' grant of summary judgment and remand this case to the trial court for further proceedings consistent with this opinion.

Costs of this appeal are taxed to River Park Hospital, Inc., for which execution may issue, if necessary.

WILLIAM C. KOCH, JR., J., not participating.